IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> DWAYNE FOUNTAIN, <br><br> Defendant. | Criminal Action No. 23-49-CFC-1 |

## MEMORANDUM ORDER

The Superseding Indictment in this action charges Defendant Dwayne Fountain with eleven counts of federal drug offenses and two counts of possession of a firearm by a convicted felon. D.I. 17. Pending before me is Fountain's motion to suppress any evidence obtained directly or indirectly from a court-ordered wiretap of a phone referred to as "Target Telephone 1" and "TT1." D.I. 70. Fountain argues that the order authorizing the wiretap was issued without probable cause or necessity in violation of the Fourth Amendment and § 2518 of the Wiretap Act, 18 U.S.C. § 2510 *et seq.*, and, alternatively, that the affidavit submitted in support of the wiretap application contained material false statements that entitle Fountain to an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). D.I. 70.

The order authorizing the challenged wiretap was issued on March 24, 2023 by District Judge Richard G. Andrews. The application for the wiretap application was supported by an 86-page affidavit submitted by DEA Task Force Officer Christopher Solda. D.I. 70-1.

I.

To issue an order authorizing law enforcement to wiretap a particular phone, a judge must find that probable cause exists to believe that "an individual is committing, has committed, or is about to commit" an offense enumerated in § 2516 of the Wiretap Act, and that "there is probable cause for belief that particular communications concerning that offense will be obtained through such interception[.]" 18 U.S.C. § 2518(3)(a), (b). The distribution of drugs in violation of federal law is an enumerated offense in § 2516. *See* § 2516(e).

"The[] [F]ourth [A]mendment principles are the same in an authorization for a wiretap as in a property search." *United States v. Tehfe*, 722 F.2d 1114, 1118 (3d Cir. 1983). A district court tasked with reviewing the legality of a challenged wiretap order is to "conduct only a deferential review of the initial probable cause determination made by the [judge who issued the order]." *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (citation omitted). "The role of a reviewing court is not to decide probable cause *de novo*, but to determine whether 'the [judge who

issued the wiretap order] had a substantial basis for concluding that probable cause existed.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).

Fountain argues as an initial matter that the affidavit submitted in support of the challenged wiretap "purports that [he] is the head of the Fountain drug trafficking organization (DTO) but provides very little relevant evidence to support that contention." D.I. 70 at 17. I agree. The affidavit boldly states in its first paragraph that Fountain "is believed to be a kilogram-level distributor of cocaine and fentanyl" and one of two leaders of a drug trafficking organization referred to in the affidavit as the "Fountain DTO." D.I. 70-1 ¶¶ 1, 32a. But as I held at the July 15, 2024 oral argument, not one of the 217 paragraphs that follow—either alone or read together with any other paragraph or paragraphs in the affidavit—provides a substantial basis for concluding that Fountain was engaged in drug trafficking at or around the time the government applied for a wiretap of TT1 or that Fountain was using TT1. *See* D.I. 110.

Fortunately for the government, that does not end the matter. Just as "search warrants are directed, not at persons, but at property where there is probable cause to believe that instrumentalities or evidence of crime will be found[,]" wiretaps are directed, not at persons, but at phone communications for which there is probable cause to believe that evidence of crime will be revealed. *Tehfe*, 722 F.2d at 1117 (citing *Zurcher v. Stanford Daily*, 436 U.S. 547, 553–60 (1978)).

3

In this case, the affidavit submitted to Judge Andrews provided more than a substantial basis to justify his probable cause finding. First, the affidavit set forth a substantial basis from which to reasonably conclude that an individual—William Warren—was engaged in drug distribution between January and February of 2023. *See* § 2518(3)(a). The affidavit detailed numerous examples of Warren directly selling drugs to an undercover agent. *See* D.I. 70-1 ¶¶ 70–85, 107–113. According to the affidavit, Warren sold in total "[six and a half] ounces of methamphetamine, a half ounce of crack cocaine, and 10 grams of fentanyl" to the undercover agent. D.I. 70-1 ¶ 32c.

Second, the affidavit set forth a substantial basis from which to reasonably conclude that particular communications concerning Warren's drug distribution would be obtained through intercepting the communications of TT1. *See* § 2518(3)(b). According to the affidavit, law enforcement conducted initial cellular data analysis on TT1 and observed that TT1 had 375 contacts with Warren's phone between November 2022 and January 2023. D.I. 70-1 ¶ 52.

Law enforcement also learned from Scranton authorities that TT1 had been in contact with a Scranton drug trafficking organization (the Scranton DTO) since July 2022. Additionally, on February 19, 2023, the Scranton DEA intercepted a call in which an individual was overhead changing the location of a drug deal with members of the Maximo Ortiz drug trafficking organization (Maximo Ortiz DTO)

from Newark, Delaware to Chadds Ford, Pennsylvania. D.I. 70-1 ¶¶ 100–103. The DEA later identified 136 record locations of TT1 traveling that day along the route of the two locations and 24 calls placed by TT1 near the Chadds Ford location. D.I. 70-1 ¶ 104.

The affidavit also described controlled drug transactions between Warren and an undercover agent that more likely involved TT1. *See* D.I. 70-1 ¶¶ 70–85, 107–113. The first transaction occurred on January 31, 2023, when Warren sold the undercover agent "a half ounce of crack cocaine and a half ounce of methamphetamine for $900.00." D.I. 70-1 ¶ 74. The night before, Warren's phone received two communications from TT1. D.I. 70-1 ¶ 75. The next day, Warren called the undercover agent at 3:58 PM "to set up a meeting at the Family Dollar." D.I. 70-1 ¶ 75. Warren's phone then sent three communications to TT1 from 3:58 PM to 4:00 PM. D.I. 70-1 ¶ 75. At 4:05 PM, Warren and the agent met at the Family Dollar and Warren gave the agent "only a portion of the drugs." D.I. 70-1 ¶ 75. Warren then left the Family Dollar and went to his apartment. D.I. 70-1 ¶ 75. Warren's phone exchanged five additional communications with TT1 from 4:09 PM to 4:35 PM, including an outgoing call that lasted 23 seconds. D.I. 70-1 ¶ 75. Warren and the agent then met up again, this time at a Grotto Pizza at 4:45 PM, when Warren gave the agent "the remainder of the drugs." D.I. 70-1 ¶ 75. Warren's phone subsequently sent a communication to TT1 at 4:52 PM and

5

placed an outgoing call to TT1 at 6:10 PM that lasted over a minute. D.I. 70-1 ¶ 75.

On February 9, 2023, the undercover agent bought four ounces of methamphetamine from Warren for $2,000.00. D.I. 70-1 ¶¶ 77, 83. The night before, Warren's phone sent two outgoing communications to TT1. D.I. 70-1 ¶ 84. The next day at 11:52 AM Warren's phone exchanged a call with TT1 that lasted nearly three minutes, and it exchanged another call with TT1 at 2:49 PM. D.I. 70-1 ¶ 84. Throughout that day, Warren told the agent "that he did not have the product and was waiting for it to arrive" and "asked the [agent] to give him some time to get it." D.I. 70-1 ¶ 79. At 5:10 PM, Warren directed the agent to a Grotto Pizza in Dover "to complete the transaction." D.I. 70-1 ¶ 81. Warren sold four ounces of methamphetamine to the agent in his car at the Grotto Pizza, and the agent exited Warren's car at approximately 5:29 PM. D.I. 70-1 ¶¶ 83–84. Warren's phone then exchanged two outgoing communications with TT1 at 5:32 PM. D.I. 70-1 ¶¶ 83–84. Warren contacted the agent once again at approximately 5:33 PM and told the agent he owed Warren more money for the methamphetamine, and the agent then returned to Warren's vehicle and made an additional payment. D.I. 70-1 ¶¶ 83–84.

On February 21, 2023, Warren sold approximately two ounces of methamphetamine and ten grams of fentanyl to the undercover agent for

6

$1,600.00. D.I. 70-1 ¶¶ 109–110. On February 20, Warren's phone exchanged eleven communications with TT1 from 5:05 AM to 9:20 PM. D.I. 70-1 ¶ 112. Warren also Facetime called the agent the night of February 20 and "told the [agent] he had the product for the deal the next day." D.I. 70-1 ¶ 108. On February 21, Warren's phone exchanged eight calls with TT1 from 12:14 PM to 2:21 PM. D.I. 70-1 ¶ 112. At 2:27 PM, Warren and the agent spoke on the phone and arranged to meet at a particular address. D.I. 70-1 ¶ 110. The agent entered Warren's vehicle at 2:41 PM, purchased the drugs, and exited Warren's vehicle at 2:46 PM. D.I. 70-1 ¶ 110. Warren's phone then called TT1 at 2:47 PM for over a minute, and the two phones exchanged five additional calls—and six communications total—between 3:26 PM and 5:45 PM. D.I. 70-1 ¶ 112.

For all three controlled buys, the affidavit concluded that TT1 was being used to communicate with Warren about the drug transactions. D.I. 70-1 ¶¶ 76, 85, 113. The timing of these calls with respect to Warren's drug transactions, in addition to TT1's previously-investigated connection with Warren, the Scranton DTO, and the Maximo Ortiz DTO, all support a probable cause finding.

In sum, Task Officer Solda's affidavit provided a substantial basis to support Judge Andrews's probable cause finding. *See* § 2518(3)(a), (b). Because "a substantial basis exists to support the [judge's] probable cause finding, [I] must uphold that finding even if a different [judge] might have found the affidavit

7

insufficient to support a warrant." *Stearn*, 597 F.3d at 554 (internal quotation marks and citation omitted).

II.

Fountain argues next that the affidavit submitted in support of the challenged wiretap application did not demonstrate "necessity" to intercept the communications of TT1 under § 2518(1)(c). D.I. 70 at 33–39.

Under § 2518(1)(c), the government must demonstrate "necessity" when applying for wiretap authorization. *United States v. Bailey*, 840 F.3d 99, 113–14 (3d Cir. 2016). To satisfy this requirement, the application must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" § 2518(1)(c). Thus, a court may approve a wiretap application when the government demonstrates that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" § 2518(3)(c).

Importantly, Section 2518(3)(c) "does not require the government to exhaust all other investigative procedures before resorting to electronic surveillance" and rather "[t]he government need only lay a factual predicate sufficient to inform the judge why other methods of investigation are not sufficient." *Bailey*, 840 F.3d at 114 (citations omitted). Ultimately, the "necessity" requirement "must be

8

...

reviewed in a practical and common sense fashion," and "the statutory burden on the government is not great[.]" *United States v. Armocida*, 515 F.2d 29, 37–38 (3d Cir. 1975) (internal quotation marks and citations omitted).

In this case, Task Officer Solda's affidavit laid a factual predicate sufficient to inform Judge Andrews why other methods of investigation were insufficient for the investigation. The affidavit explained how law enforcement exhausted the normal investigative techniques and that such techniques would not have succeeded or would be too dangerous. D.I. 70-1 ¶¶ 126–215.

The affidavit stated at the outset that a wiretap authorization was necessary to uncover the different members of the drug trafficking organization the government was investigating (the Target DTO), who supplied the Target DTO, how members of the Target DTO "store and launder their drug proceeds," the locations where members of the Target DTO store cocaine, fentanyl, and methamphetamine, and the relationships between members of the Target DTO. D.I. 70-1 ¶ 128. The affidavit then provided summaries of each of the normal investigative techniques that had "been attempted and have failed, reasonably appear to be unlikely to succeed, or are too dangerous to employ under the circumstances of this investigation." D.I. 70-1 ¶ 130; *see* D.I. 70-1 ¶¶ 131–195.

The affidavit first explained how physical surveillance had been unsuccessful at accomplishing the target objectives of the investigation. *See*

9

D.I. 70-1 ¶¶ 131–142. For example, the affidavit discussed how counter-surveillance techniques employed by members of the Target DTO rendered physical surveillance challenging and unfruitful for law enforcement. As the affidavit explained,

> [i]t is common knowledge that the street-level drug distributors in this area utilize several "look-outs" to ensure that they are not being surveilled by law enforcement. Additionally, [Task Officer Solda] has observed subjects, who appeared to be acting as look-outs, intently looking at passing vehicles to see who is inside and how frequently they pass. For this reason, surveillance can only be conducted for very short amounts of time in this area and although there is video surveillance in some of the areas there are many areas not covered.

D.I. 70-1 ¶ 136.

Target DTO members would also counter-surveil in vehicles. Warren, for example, would "change locations for the [undercover agent] to meet him and often turn down random roads in the city limits of Dover to see what vehicles follow." D.I. 70-1 ¶ 137. On one occasion, counter-surveillance techniques helped thwart surveillance of a planned meet where "over ten members assist[ed] in surveillance" and a drug supplier "was intercepted on a phone call by the Scranton DEA describing several vehicles used by members of surveillance." D.I. 70-1 ¶ 138.

In *Bailey*, the Third Circuit pointed to similar conduct by a drug-trafficking organization in response to law enforcement surveillance in support of its rejection of a necessity argument on a suppression motion. *See* 840 F.3d at 115–16. As the Third Circuit found,

> [c]ontinued physical surveillance was likely to be fruitless because most of the associates were surveillance conscious, avoiding locations that were visible to security cameras. They were also occasionally aware of surveillance vehicles when they were present (some of these defendants even alerted each other to the presence of surveillance vehicles).

*Id.* at 115. Similarly here, the government demonstrated in its affidavit that the counter-surveillance techniques employed by the Target DTO would render physical surveillance unhelpful in accomplishing the target objectives of the investigation.

The affidavit also explained that other normal investigative techniques were unsuccessful at accomplishing the target objectives of the investigation: (1) pole cameras were ineffective in showing the operations of the Target DTO because "the scope of the cameras [were] limited" and the drug transactions at issue were not being conducted in areas that pole cameras could cover, D.I. 70-1 ¶¶ 143–145, (2) GPS tracking devices on vehicles would be "extremely difficult" to install and were previously unsuccessful in tracking Warren, D.I. 70-1 ¶¶ 146–149, (3) cell phone location data was imprecise, D.I. 70-1 ¶¶ 150–153, (4) the target subjects

11

would be uncooperative if called to testify before a grand jury and could alert Target DTO members of the ongoing investigation, D.I. 70-1 ¶¶ 154–155, (5) confidential informants had been unable to infiltrate the inner workings of the Target DTO, D.I. 70-1 ¶¶ 156–166, (6) undercover agents previously helped law enforcement further the investigation by conducting purchases with Warren, but the purchases "did not provide agents with sufficient insight into the inner workings" of the Target DTO and introducing new undercover agents would be a safety risk, D.I. 70-1 ¶¶ 167–172, (7) interviews of subjects or associates would be insufficient in identifying the sources and locations of the Target DTO's drugs and could also risk revealing the investigation, D.I. 70-1 ¶¶ 173–175, (8) search warrants would be ineffective at locating the Target DTO's drug supplies because the Target DTO stored its drugs at "multiple locations, spread geographically throughout" Dover, Kent County, and New Castle County, D.I. 70-1 ¶¶ 176–180, (9) pen registers and telephone toll information could not identify the sources of the controlled substances or establish proof of conspiracy, D.I. 70-1 ¶¶ 181–182, (10) trash pulls and mail covers would not garner sufficient evidence to meet the target objectives, D.I. 70-1 ¶¶ 183–188, (11) financial investigation would be ineffective because "it is very uncommon for drug traffickers to pay their drug suppliers in anything other than cash," D.I. 70-1 ¶¶ 189–190, and (12) a

12

combination of these techniques had proved ineffective to law enforcement, D.I. 70-1 ¶¶ 191–195.

In sum, the affidavit laid a factual predicate sufficient to inform Judge Andrews why other methods of investigation were insufficient to accomplish the purposes of the investigation. *See* § 2518(1)(c).

### III.

Lastly, Fountain argues that he is entitled to a *Franks* hearing "because the warrant application and affidavit contained false statements that were [made] knowingly and intentionally, or with reckless disregard for the truth[,] [and] these false statements were necessary in determining probable cause." D.I. 70 at 39.

An affidavit supporting a search warrant is presumed to be valid. *Franks*, 438 U.S. at 171. To overcome that presumption and obtain a hearing to challenge the warrant's constitutionality, a defendant "must make a 'substantial preliminary showing' that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, which is material to the finding of probable cause." *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (quoting *Franks*, 438 U.S. at 171). To make that showing,

> the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the

13

> warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

*Franks*, 438 U.S. at 171. "[I]f these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id.* (footnote omitted).

Fountain makes the following argument for a *Franks* hearing:

> For the several reasons explained in the previous paragraphs of this motion, Petitioner is entitled to a *Franks* hearing. Particularly due to the inconsistency of Petitioner's phone either being in contact or not with a member of the Scranton DTO, and the lack of proof that Petitioner ever met with the Scranton DTO. It is also clear the Affiant was using the same information in different warrants for different purposes inconsistent with each other. If the information about alleged contacts with the Scranton DTO is stricken from the warrant, then the warrant lacks any other grounds to establish probable cause. Is Petitioner's daughter removing bags from his house enough even though there is no evidence Petitioner had any contact by phone or in person with Deeter? Is another family member, Martin Fountain, selling narcotics to CS on several occasions without the involvement of Petitioner by phone or in person enough? Is TT1 being in contact for extremely brief periods of time with Warren while Warren is selling drugs without any information about the context of the calls or messages enough? Is Petitioner having thirty (30) year old convictions for illegal narcotics delivery enough? Petitioner suggests strongly that this would not suffice. Would agents be able to recognize Petitioner's voice due

14

>   to one phone conversation and barely being able to hear someone talk in a restaurant at dinner time pass the scrutiny of Rule 901?  Petitioner strongly suggests that would not survive Rule 901.

D.I. 70 at 41.

None of these assertions—alone or in combination—make a substantial preliminary showing that Task Force Officer Solda's affidavit contains a false statement that was made knowingly or with reckless disregard for the truth and is material to the finding of probable cause.  None of the assertions specifically identifies a statement in the affidavit that is deliberately false or made in reckless disregard for the truth.  *See Franks*, 438 U.S. at 171.  None constitutes an "offer of proof" or "a statement of supporting reasons" that would justify a *Franks* hearing.  *See id.*  Fountain also does not include any affidavits or sworn statements in support of his argument.  *See id.*  Fountain relies instead on a series of rhetorical questions that are unhelpful to the *Franks* analysis.  *See* D.I. 70 at 41.

Accordingly, I find that Fountain is not entitled to a *Franks* hearing.

\* \* \* \*

NOW THEREFORE, at Wilmington on this Twelfth day of August in 2024, it is HEREBY ORDERED that Defendant Dwayne Fountain's motion to suppress

15

evidence (D.I. 70) is DENIED.

_____
CHIEF JUDGE