IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA

Plaintiff,

v.

DWAYNE FOUNTAIN,

Defendant.

Criminal Action No. 23-49-CFC

**MEMORANDUM ORDER**

The Superseding Indictment in this action charges Defendant Dwayne Fountain with eleven counts of drug offenses and two counts of possession of a firearm by a convicted felon. D.I. 18. Pending before me is Fountain's motion to suppress all physical evidence seized during the search of Fountain's residence at 2000 Varsity Lane, Apartment 909, Bear, Delaware in May 2023. D.I. 69. Apartment 909 is located in the 900 building of the School Bell Apartment complex at 2000 Varsity Lane in Bear.

The challenged search was conducted pursuant to a warrant issued on May 16, 2023 by Magistrate Judge Fallon. The application for the warrant was supported by an affidavit submitted by Drug Enforcement Administration (DEA) Task Force Officer (TFO) Christopher Solda. D.I. 78. Fountain argues in support

of his motion that (1) the warrant authorizing the search was issued without probable cause in violation of the Fourth Amendment, (2) he is entitled to an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), and (3) the good faith exception to the warrant requirement does not apply to the challenged search. D.I. 69 at 8–26.

I.

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. It provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

*Id.* "The ultimate touchstone of the Fourth Amendment . . . is reasonableness." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (*per curiam*) (internal quotation marks and citation omitted). To deter the government from violating the Fourth Amendment, evidence collected through an unreasonable search or seizure may be suppressed. *See United States v. Katzin*, 769 F.3d 163, 169 (3d Cir. 2014). Evidence that is not acquired directly through a Fourth Amendment violation but would not have been acquired but for investigators exploiting a Fourth Amendment violation may also be suppressed as "fruit of the poisonous tree." *United States v.*

*DeSumma*, 272 F.3d 176, 179 (3d Cir. 2001) (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

A district court tasked with reviewing the legality of a challenged search warrant is to "conduct only a deferential review of the initial probable cause determination made by the magistrate" who issued the order. *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (citation omitted). "The role of a reviewing court is not to decide probable cause *de novo*, but to determine whether 'the magistrate had a substantial basis for concluding that probable cause existed.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).

In this case, the affidavit submitted to Magistrate Judge Fallon provided more than a substantial basis to justify her probable cause finding. As detailed in TFO Solda's affidavit:

- In or around June 2022, an investigative team consisting of officers from the Delaware State Police (DSP) and Dover Police Department (DPD) and agents from the DEA identified Fountain as a member of a drug trafficking organization (DTO) with operations in Delaware and Pennsylvania. D.I. 78 ¶ 1.

- As part of the investigation, DEA agents obtained wiretaps of two of Fountain's cell phones from March 24, 2023, until on or about May 13, 2023. *See* D.I. 78 ¶¶ 26–28. Through the wiretaps, DEA agents overheard Fountain organize several drug deals, and read text messages between Fountain and suspected drug suppliers related to the acquisition of large quantities of drugs. D.I. 78 ¶¶ 29, 53, 74. The investigation also revealed

  that Fountain commonly distributed drugs at Grotto's Pizza and the Green Turtle in Dover, Delaware. D.I. 78 ¶ 29.

- Fountain had been seen at his residence (i.e., apartment 909, Varsity Lane) during prior surveillance conducted around 2013 and 2014. D.I. 78 ¶ 66.

- Documents obtained from a subpoena served in March 2023 on the School Bell Apartment complex showed Fountain as the named tenant of apartment 909 since November 22, 2012. D.I. 78 ¶ 66.

- On March 26, 2023, members of the investigative team conducted surveillance on Fountain. D.I. 78 ¶ 67. At approximately 12:55 p.m., one of the officers saw Fountain exit his apartment and drive away in a Volkswagen Passat. D.I. 78 ¶¶ 5, 68. Fountain drove to the Persimmon Tree Lane apartment complex in Dover. D.I. 78 ¶¶ 5, 69. An hour later, "electronic surveillance"[1] showed William Warren—a suspected high-level subordinate in the DTO—exiting a Persimmon Tree Lane apartment and entering the front passenger seat of Fountain's car. D.I. 78 ¶¶ 2, 69. While Warren was inside the car, he texted "I[']m ready" to an undercover police officer who had asked Warren the previous day to sell him two ounces of methamphetamine and ten grams of fentanyl. D.I. 78 ¶ 70 & n. 7. Just before 3:00 p.m., Warren exited Fountain's car and entered his Persimmon Tree Lane apartment. At approximately 4:50 p.m., the undercover officer met with Warren and purchased approximately two ounces of methamphetamine and ten grams of fentanyl. D.I. 78 ¶ 70.

---

[1] The affidavit does not identify what type of "electronic surveillance" was employed on this particular occasion. Presumably, "electronic surveillance" refers to GPS and/or cell phone tower data. *See* D.I. 78 ¶ 80 ("[D]uring this investigation, investigators monitored the authorized cell tower data from [Fountain's phones] and GPS tracker data on [Fountain's cars].")

- On March 27, 2023, members of the investigative team again conducted surveillance on Fountain. D.I. 78 ¶ 71. At "approximately 3:59 p.m.," one of the officers—DPD Sergeant Martinek—saw Fountain exit his apartment with a white plastic bag with a yellow smiley face on its side (the "Smiley Face bag"). Fountain threw the Smiley Face bag into a nearby dumpster. D.I. 78 ¶ 71. After Fountain left the area, DPD Sergeant Martinek went to the dumpster and retrieved the Smiley Face bag. The bag was one of a "few bags" in the dumpster and the only plastic bag with a smiley face. D.I. 78 ¶ 71. Sergeant Martinek took the bag to DEA's Dover office, where TFO Solda opened the plastic bag and observed what he believed, based on his training and experience, was a wrapper for a kilogram of drugs. D.I. 78 ¶ 71. The wrapper was stamped "QR10." D.I. 78 ¶ 71. Solda noted "that kilograms of drugs are commonly wrapped in particular types of plastic wrapping, like the wrapping [Fountain] threw in the dumpster." D.I. 78 ¶ 72. According to Solda, the wrapping had remnants of a "white powder substance" on it, and the shape of the wrapping appeared as though something with a "brick-like shape" had been inside of the wrapping. D.I. 78 ¶ 72.

- On April 15, 2023, Fountain placed an outgoing call to a customer named Christopher Hall. D.I. 78 ¶ 53. Based on the intercepted conversation between Fountain and Hall, investigators determined that Fountain would be meeting with Hall to provide him with drugs. D.I. 78 ¶ 54. At approximately 12:48 p.m., Fountain left his apartment and drove to a restaurant called the Green Turtle. D.I. 78 ¶ 57. At approximately 12:58 p.m., a surveillance officer saw Fountain enter the Green Turtle. D.I. 78 ¶ 58. Approximately ten minutes later, Hall was observed exiting the restaurant and entering the front passenger seat of Fountain's car. D.I. 78 ¶ 59. Two minutes later, Hall got out of Fountain's car and entered

    the front passenger seat of an Acura. D.I. 78 ¶ 59. The Acura then drove off. D.I. 78 ¶ 59. Investigators followed the Acura as it drove north on I-95 and I-495. D.I. 78 ¶ 60. Hall was subsequently stopped by DSP and found to be in possession of approximately ten ounces of cocaine, in packaging that was consistent with that of the drugs the undercover officer had bought from Warren. D.I. 78 ¶ 60.

- On April 16, 2023, investigators set up surveillance at Grotto's Pizza in Dover. D.I. 78 ¶ 73. At approximately 2:47 p.m., "electronic surveillance" showed Fountain leaving the Varsity Lane apartment complex in his Passat. D.I. 78 ¶ 73.[2] At approximately 3:24 p.m., an officer saw Fountain arrive at, and then enter, Grotto's Pizza. D.I. 78 ¶ 73. At approximately 3:35 p.m., an officer saw Warren arrive at the Grotto's Pizza in a Chevy Trailblazer. D.I. 78 ¶ 74. Warren was then seen entering the restaurant. D.I. 78 ¶ 74. Once both Fountain and Warren were inside the Grotto's Pizza, Warren contacted the undercover officer that he was ready, and that the undercover officer should come to Grotto's Pizza. D.I. 78 ¶ 74. At approximately 4:15 p.m., an officer saw Warren leave Grotto's Pizza and drive from the parking lot in his Trailblazer. Five minutes later,

[2] The affidavit literally states in paragraph 73 that "electronic surveillance showed D. FOUNTAIN leaving TARGET LOCATION-2 in TARGET VEHICLE-1." The affidavit defines TARGET LOCATION-2 as Fountain's apartment (i.e., apartment 909). Obviously, Fountain could not have left his apartment in his car, and thus it is clear that TFO Solda meant to say in paragraph 73 that electronic surveillance showed Fountain leaving the apartment complex. TFO Solda similarly referred to the apartment complex as TARGET LOCATION-2 in paragraph 77 of the affidavit. *See* D.I. 78 ¶ 77 (stating that "an officer observed D. FOUNTAIN depart TARGET LOCATION-2 in TARGET VEHICLE-2"). I view the references to the apartment as opposed to the apartment complex in these two instances as inadvertent and of no moment. In no way do the references suggest that TFO Solda was intentionally misleading the magistrate judge; nor could these mistaken references be reasonably characterized as "reckless."

    another officer saw Warren drive the Trailblazer to Warren's apartment, enter the apartment, and, eleven minutes later, exit his apartment. D.I. 78 ¶ 74. At approximately 5:20 p.m., an officer saw Warren arrive at the Grotto's Pizza and go inside. D.I. 78 ¶ 74. Ten minutes later, the undercover officer met with Warren at Grotto's Pizza and purchased from Warren approximately two ounces of methamphetamine and ten grams of fentanyl. D.I. 78 ¶ 74.

- On May 3, 2023, at approximately 8:39 a.m., Fountain received an incoming call from a customer named Darryl Brooks. D.I. 78 ¶ 75. Fountain agreed to bring Brooks "three, three and a half" by "run[ing] into [him] at the supermarket." D.I. 78 ¶ 75. TFO Solda stated in his affidavit that based on his training and experience he believed "three, three and a half" referred to ounce quantities of drugs. D.I. 78 ¶ 76. At approximately 10:37 a.m., an officer observed Fountain leave his apartment in a Nissan Pathfinder. DI. 78 ¶ 77. At approximately 10:45 a.m., an officer saw Fountain enter a Giant supermarket parking lot and meet with Brooks. D.I. 78 ¶ 77. Fountain and Brooks entered the Giant store, and approximately ten minutes later, they emerged from the store and got into Fountain's Pathfinder. D.I. 78 ¶ 78. The Pathfinder drove to a white pickup truck, at which point Brooks got into the pickup truck and drove away. D.I. 78 ¶ 79. Fountain then drove back to his apartment. D.I. 78 ¶ 79.

- Cell tower data for Foutain's phones and GPS tracking data for Fountain's Passat and Pathfinder showed that for the duration of the investigation Fountain spent his nights at his apartment. D.I. 78 ¶ 80.

    This evidence was more than sufficient to establish probable cause that Fountain was a drug dealer in the spring of 2023 and that evidence of his drug

dealing—including, but not limited to, drugs, drug packaging materials, and proceeds obtained from drug sales—would be found at his apartment. Fountain insists that the search warrant affidavit "fail[ed] to establish a nexus" between his alleged drug dealing and the apartment, but that nexus was established by Sergeant Martinek's reported observation on March 27, 2023 of Fountain leaving his apartment with the Smiley Face bag in hand, the near-immediate retrieval of that bag from the dumpster, the markings on and shape of the wrapping found inside the bag, and the white powdery remnants seen by TFO Solda on the wrapper.

II.

Fountain's primary argument is that he is entitled to a so-called *Franks* hearing because there were false or misleading statements included in the affidavit of probable cause for the search warrant application for his apartment. D.I 69 at 8–23.

An affidavit supporting a search warrant is presumed to be valid. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). To overcome that presumption and obtain a hearing to challenge the warrant's constitutionality, a defendant "must make a 'substantial preliminary showing' that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, which is material to the finding of probable cause." *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (quoting *Franks*, 438 U.S. at 171). To make that showing,

> the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Franks*, 438 U.S. at 171. "[I]f these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id.*

As best I can tell from his briefing, Fountain contends that the affidavit supporting the search warrant contained three false statements, all of which relate to the recovery of the wrapper in the Smiley Face bag retrieved by Sergeant Martinek from the dumpster next to Fountain's apartment.

Fountain first alleges that TFO Solda made a false statement when he stated in the affidavit that "DPD Sgt[.] Martinek observed D. FOUNTAIN exit [Fountain's apartment]" on March 27, 2023. D.I. 78 ¶ 71. According to Fountain, "Sgt. Martinek did not see Fountain exit [his apartment], which was specifically listed in the affidavit as apartment 909, not building 900." D.I. 69 at 12. In

support of this allegation, Fountain points to (1) a DEA report regarding the surveillance of Fountain on March 27, 2023 that states that "Sgt. Martinek observed FOUNTAIN exit building 900," D.I. 71, Defense Ex. B; and (2) a photograph of the 900 building of the School Bell Apartment complex that was attached to TFO Solda's affidavit, D.I. 71, Defense Ex. A at 65. Fountain argues that Sergeant Martinek could not have observed the exact apartment in the 900 building without compromising his surveillance position. D.I. 69 at 12.

This line of argument fails for at least three reasons. As an initial matter, even assuming that Sergeant Martinek saw Fountain exit the 900 building but did not see him exit apartment 909, Fountain has not made a substantial showing that TFO Solda deliberately lied or recklessly disregarded the truth when he stated in the affidavit that Sergeant Martinek saw Fountain exit apartment 909. *See United States v. Rivera*, 524 F. App'x 821, 826 (3d Cir. 2013) (affirming denial of *Franks* hearing when proof offered reflected only on the veracity of confidential informants relied on in affidavit and not on veracity of the affiant). Fountain alleges that TFO Solda either "fabricate[d] [facts] for the sole purpose of bolstering probable cause," D.I. 69 at 14, or "reckless[ly] disregard[ed]" statements found in the DEA report, D.I. 69 at 13. But such conclusory assertions are insufficient to overcome the presumptive validity of the affidavit. *Franks*, 438 U.S. at 171. Second, again assuming for argument's sake that Sergeant Martinek saw Fountain

exit the 900 building but did not see him exit apartment 909, the challenged statement was not material to Magistrate Judge Fallon's finding of probable cause, as documents obtained from the apartment complex confirmed that Fountain lived in apartment 909, and it is undisputed that apartment 909 is located in the 900 building. *See* D.I. 77 at 8–9 & n. 1; *see generally* D.I. 92. Third, the two documents Fountain points to do not establish that Sergeant Martinek did not see Fountain leave apartment 909. The fact that Sergeant Martinek observed Fountain exit building 900 does not mean that he did not also see Fountain exit apartment 909. And the photograph of the 900 building does not establish that Sergeant Martinek could not have observed the door to apartment 909 without compromising his surveillance position. On the contrary, the photograph shows that all the doors to the apartments in the front of the building are external doors visible from the parking lot, and it is undisputed that apartment 909 is in the front of the building. *See* D.I. 78 at 64; D.I. 77 at 9 n.1; *see generally* D.I. 92.

Fountain next alleges that "[i]t was either a deliberate falsehood that [the wrapper stamped "QR10" in the Smiley Face bag retrieved by Sergeant Martinek from the dumpster] contained a white powdery substance, or there was a reckless disregard for the truth by not including in the affidavit of probable cause that, when tested at the lab, [the wrapper] had no indication of a white powdery substance or any controlled substances." D.I. 69 at 13–14. In support of this allegation,

Fountain cites a DEA lab report for the contents of the Smiley Face bag. The report states "No Controlled Substance" under the heading "Substances" and states "Liquid" under the heading "Form." D.I. 71, Defense Ex. C. According to Fountain, these statements in the lab report prove that "[t]here was no white powdery substance" on the wrapping. D.I. 69 at 13. Putting aside the fact that TFO Solda never stated in his affidavit that the white powdery substance was cocaine or any other controlled substance, Fountain does not allege, let alone establish by an affidavit or other reliable source, that TFO Solda saw the DEA lab report or knew of the results of the DEA lab's analysis before he submitted his affidavit to Magistrate Judge Fallon. Thus, Fountain has not made a substantial showing that TFO Solda made a deliberately false statement or recklessly disregarded the truth. *Franks*, 438 U.S. at 171.

Lastly, Fountain argues that "there was an intentional falsehood [in TFO Solda's affidavit] about what was in the dumpster when the plastic bag with the smiley face [wa]s recovered[.]" D.I. 69 at 16. In support of this accusation, Fountain points to an undated photograph that is time-stamped 8:42 a.m. D.I. 71, Defense Ex. F. According to Fountain:

> The photograph is time stamped at. 8:42 a.m., showing the time this dumpster is emptied. The "trash pull" from the dumpster was approximately seven (7) hours after the time this dumpster is emptied. It again belies logic that

> after seven (7) hours, this common dumpster would either have one (1) bag in it, or a few other bags in it.

D.I. 69 at 16. Assuming for arguments' sake that the unauthenticated photograph depicts the dumpster in question and was in fact taken seven hours before Sergeant Martinek retrieved the Smiley Face bag from the dumpster, it does not "belie[] logic" that the dumpster would have only "a few bags" in it seven hours after it was emptied. Thus, the photograph in no way establishes that Sergeant Martinek did not observe "a few bags" in the dumpster, let alone that TFO Solda deliberately lied or recklessly disregarded the truth when he reported that Sergeant Martinek saw a few bags in the dumpster that afternoon.

In sum, Fountain has failed to make a substantial showing of an intentional or reckless material falsehood that would justify a *Franks* hearing.

III.

"In *United States v. Leon*, the Supreme Court recognized that the purpose of the exclusionary rule—to deter police misconduct—would not be furthered by suppressing evidence obtained during a search 'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope.'" *United States v. Tracey*, 597 F.3d 140, 150 (3d Cir. 2010) (quoting *United States v. Leon*, 468 U.S. 897, 919–20 (1984)). "[T]he good faith exception does not apply in four limited circumstances:

> 1) where the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;
>
> 2) where the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function;
>
> 3) where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or
>
> 4) where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized."

*Id.* at 151.

Fountain argues that the good faith exception does not apply here because the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit, and because the affidavit so lacked the necessary indicia of probable cause that the officers who executed the challenged search unreasonably relied on the warrant. D.I. 69 at 8.

With respect to Fountain's first argument, I have already determined that he has not made a substantial showing that the search warrant affidavit was deliberately or recklessly false. With respect to Fountain's second argument, I have already determined that TFO Solda's affidavit contained sufficient evidence to justify Magistrate Judge Fallon's finding of probable cause and issuance of the warrant. It follows, then, that it was objectively reasonable for the officers who

executed the warrant to rely on it. *United States v. Hodge*, 246 F.3d 301, 309 (3d Cir. 2001).

* * * *

NOW THEREFORE, at Wilmington on this Nineteenth day of August in 2024, it is HEREBY ORDERED that Defendant Dwayne Fountain's Motion to Suppress Evidence (D.I. 69) is **DENIED**.

CHIEF JUDGE